# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SEAN LYNCH, individually and on behalf of all others similarly situated, | Case No.: 1:19-cv-00273 |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| 3M COMPANY., a Delaware Corporation., | |
| Defendant. | |

Plaintiff Sean Lynch ("Plaintiff" or "Maj. Lynch"), individually and on behalf of a Class defined below of similarly situated persons, alleges the following against Defendant 3M Company, Inc. ("Defendant 3M" or the "Company") based upon personal knowledge with respect to himself, and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters, the following.

## NATURE OF THE CASE

1.      Defendant 3M, and its predecessor in interest, Aearo Corporation, made the Combat Arms™ Earplugs, Version 2 (CAEv2)  ("Earplug" or "Earplugs"), a dual-ended, selective attenuation earplug for combat use. The Earplugs were designed as a single set of earplugs that provided soldiers with two options for use depending on which end of the earplug was being used. Worn in the closed position (green end), the Earplugs were supposed to offer protection from all sounds. Worn in the open position (yellow end), the Earplugs were supposed to significantly reduce loud impulse noises such as gunfire or battlefield explosions, while still allowing the wearer to hear low-level sounds critical to mission safety such as voice commands or the footsteps of approaching enemies.

2.     Unbeknownst to the military personnel who wore them, these Earplugs suffered from a dangerous design defect that caused the Earplugs to loosen in the wearer's ear, thereby permitting damaging sounds to enter the ear canals by traveling around the Earplug. The loosening caused by the defect was imperceptible to the wearer who had no reason to believe the Earplug were not operating as represented and then, as a result, were unknowingly exposed to dangerous levels of impulse noise.

3.     Specifically, the stem design of the Earplugs was simply too short and could not be inserted deep enough into the ear canal in order to obtain a proper fit. When the Earplug is inserted into the ear canal pursuant to the fitting instructions provided by Defendant, the basal edge of the third flange of the non-inserted end of the earplug becomes prone to press against the wearers' ear canals and fold back to its original shape, thereby loosening the seal in their ear canal and exposing the wearer to dangerous levels of impulse noises. The Earplug is symmetrical; therefore, the defect exposes the wearer to dangerous levels of noise, notwithstanding which side of the Earplug was being used.

4.     In 2003, Defendant won a bid to supply the Combat Arms™ Earplugs to the U.S. Military and ultimately became its exclusive supplier of combat earplugs until 2015, when the product was discontinued.  The specification that the Earplugs were required to meet required that the Earplugs be designed to and in fact offer protection from chronic noise, and separate impulse noise created by military firearms. The Earplugs were required to meet certain sound attenuation specifications for the green end (chronic noise) and separate sound specifications for the yellow end (impulse noises).  The Earplugs failed to meet the design and sound attenuation specifications required by contract.

5.      The design defect plaguing the Combat Arms™ was known to Defendant and its predecessor well in advance of its sale to the U.S. Government and distribution to soldiers for use. In advance of the sale, Defendant conducted testing which unequivocally revealed the existence of the defect and resulted in the closed end of the Earplugs being half as effective at blocking sound as it ultimately claimed to be, and the open end of the Earplugs amplified sound rather than blocking it. Instead of redesigning the Earplugs, however, Defendant secretly altered the fitting and insertion procedure before the required specification testing to compensate for the defect and then retested the closed-end of the Earplugs. The secretly altered fitting procedure allowed the Defendant to artificially boost the Earplugs noise reduction rating sufficiently for Defendant to win the bid.

6.      By the time the Earplugs were discontinued in November 2015, 3M had sold millions of Earplugs to the U.S. Government, recklessly exposing tens of thousands of military personnel to the devastating effects of exposure to high levels of impulse noise.

7.      In 2016, Moldex-Metric, Inc., a designer and manufacturer of non-linear dual-mode earplugs, filed suit in the name United States Government under the False Claims Act to recover penalties and damages arising from false statements made by 3M to the Government regarding its defective Combat Arms™ Earplugs, Version 2 (CAEv2)  (the "Qui Tam Complaint"). In July 2018 the Department of Justice announced that 3M agreed to pay $9.1 million to resolve allegations that it knowingly sold the Earplugs to the United States military without disclosing defects that hampered the effectiveness of the device that could exacerbate, rather than mitigate, the noise it was intended to protect against.

8.      Plaintiff Sean Lynch is an officer of the U.S. Marine Corps. in which he has dutifully served for nearly 19 years. In the course of his service, Major Lynch was exposed to impulse noises from weapons fire during his combat and non-combat duties. The Marine Corps provided Maj.

Lynch with Defendant's Combat Arms™ Earplugs, Version 2 (CAEv2) manufactured by 3M or its predecessor Aearo Corporation, the purpose of which was to protect Maj. Lynch and other soldiers from the concussive effects associated with service-related impulse noise (e.g. weapons fire).

9.  In sum, 3M Combat Arms™ Earplugs were given to soldiers to protect them from hearing damage resulting from close range weapons fire and battlefield ordinance discharge. Due to a design defect known to 3M, however, the Earplugs did not perform as intended resulting in the exposure of tens of thousands of soldiers to dangerous levels of impulse noise that in turn could cause hearing maladies.

10.  This lawsuit seeks relief on behalf of Maj. Lynch and a Class of all military personnel that have used Combat Arms™ Earplugs. The lawsuit seeks medical monitoring for Plaintiff and the Class to help diagnose and/or mitigate hearing loss and hearing related maladies resulting from the use of 3M's defective product. Plaintiff seeks declaratory relief and damages in the form of the reasonably necessary costs of diagnostic testing and mitigation, and asserts claims for negligence, fraudulent concealment, and fraudulent omission.

## JURISDICTION AND VENUE

11.  This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative class members, and at least some members of the proposed Class have a different citizenship from 3M.

12.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this action occurred in this District. Upon information and belief, the contract for the purchase of 3M's Combat Arms™ Earplugs was made with the Department of Defense which is headquartered in this District. Further, and upon information and belief, the ultimate decisions relating to the purchase of the Earplugs; the specifications for their purchase; and

the minimum standards and testing protocols all emanated from this District, and critical documents regarding the dissemination of the Earplugs to soldiers, as well as the identities of those soldiers can also be found in this District. Finally, the U.S. Department of Veterans Affairs, which is responsible for maintaining the records of Class members is located in this District making venue here appropriate.

13.     3M maintains an office in this District, which includes its Innovation Center, a "hub for 3M to introduce business and government decision and policy makers to its innovative solutions." Through its business operations in this District, 3M intentionally avails itself of the markets within this District to further render the exercise of jurisdiction by this Court just and proper.

## **PARTIES**

14.     Plaintiff Sean Lynch is a member of the U.S. Marine Corps (the "U.S.M.C.") serving as an Active Drilling Reservist, and currently is a resident of Mendham, New Jersey.

15.     3M Company is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in St. Paul, Minnesota. Among other things, it is in the business of designing, manufacturing, and selling worker safety products, including hearing protectors and respirators. 3M has a dominant market share in virtually every safety product market, including hearing protection, and is one of the largest companies in the country. 3M manufactured and sold the dual-ended Combat Arms™ Earplugs at issue in this litigation.

16.     The Combat Arms™ Earplugs, Version 2 (CAEv2), were originally created and designed by Aearo Company ("Aearo") which was subsequently acquired by 3M along with many of its key personnel. By acquiring Aearo, 3M assumed liability for Aearo's previous actions, and the harms resulting from and caused by the defective Earplugs.

## STATEMENT OF FACTS

**A.**   **Plaintiff's Exposure to Impulse Noise as a Result of Using 3M's Combat Arms™ Earplugs**

17.     Lieutenant Sean Lynch enlisted in the Marine Corps in August 2000 and by 2004 had been commissioned as a Second Lieutenant. During this time, Maj. Lynch had been stationed at several military facilities across the United States. In the Fall of 2004, Maj. Lynch was deployed overseas and returned to Camp Lejeune in North Carolina where he was put in charge of range running and repeatedly exposed to noise from heavy weaponry.

18.     It was standard U.S.M.C. policy for anyone exposed to weapons fire to receive and wear earplugs. Accordingly, Maj. Lynch was issued, and routinely wore the green-yellow dual-ended Combat Arms™ Earplugs.

19.     In the Fall of 2005, Maj. Lynch was deployed to Fallujah, Afghanistan. During this tour Maj. Lynch served as a Platoon Leader of an AMTRAK armored vehicle unit. While in the armored vehicles, Maj. Lynch and others used vehicle specific communications helmets which contained built in sound protection. Pursuant to standard operating procedures, however, when outside the vehicle, Maj. Lynch always wore his 3M Earplugs.

20.     Maj. Lynch returned stateside in April 2006 where he was involved with weapons training and routinely used his 3M Earplugs. In November 2006 he was re-deployed to Afghanistan and was involved in a variety of off-vehicle engagements. He routinely wore combat Earplugs.

21.     In March 2007, Maj. Lynch discharged a rocket-propelled grenade launcher. Despite wearing combat Earplugs, the noise from the discharge perforated his right eardrum. He was then treated by an army physician assistant.

22.     In or about the summer of 2007, Maj. Lynch returned from Afghanistan and received audiograms and other audio testing which confirmed hearing degradation from baseline readings taken earlier.

23.     Pursuant to U.S.M.C. protocol, Maj. Lynch continued to use his combat Earplugs whenever he would be exposed to weapons fire. For example, from 2007 to 2008, he used the Earplugs every day for two straight weeks while on the pistol and rifle ranges at Camp Lejeune, and at least on three more occasions (of 4- to 7-day periods each) between 2008 and 2009 while living in Bethesda, Maryland.

24.     In or around late 2010 to early 2011, Maj. Lynch was diagnosed with tinnitus and given 10% disability. As a result of his hearing impairment, it has become more difficult for him to hear in large environments and he suffers from painful, sharp piercing tones. The severity of his hearing impairment has increased with time and is expected to continue to degrade.

25.     Maj. Lynch's hearing loss and tinnitus was due to repeated exposure to impulse noise associated with weapons fire, which 3M's Earplugs were specifically designed to protect against. Maj. Lynch dutifully used 3M Earplugs in advanced of exposure to impulse noise. Moreover, he followed instructions for use provided by 3M to for insertion and fitting. Despite following these directions and using the 3M Earplugs in advance of exposure, Maj. Lynch suffered permanent hearing loss and damage. Had Maj. Lynch known of the defect in the Earplugs that caused the seal to imperceptibly loosen and expose him to dangerous levels of noise, he would not have worn them and instead used a non-defective earplug.

## B.     3M's Combat Arms™ Earplug

26.     3M manufactured the Combat Arms™ Earplug, a dual-ended, selective attenuation earplug designed to provide soldiers two options for hearing attenuation depending which end of

the Earplugs were worn. If worn in the closed position (green end in), the Earplugs were supposed to block all sound. If worn in the open position (yellow end in), the Earplugs were supposed to significantly reduce loud impulse sounds such as gun fire and battlefield explosions, while still allowing the wearer to hear quieter noises such as commands or approaching enemy combatants.

27.     The design defect is seen in the stem of the Earplug which is too short, so that the Earplug will not seat deep enough into the ear canal in order to achieve a proper fit. When the Earplug is inserted into wearer's the ear canal pursuant to the fitting instructions, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against the wearers' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals. The Earplug is symmetrical; and, therefore the design defect poses the same danger to the wearer when either end is inserted.



## C.     Testing Reveals the Defect

28.     In early 2000, personnel at Aearo commenced Noise Reduction Rating (NRR) testing pursuant to protocols set forth by the EPA under ANSI S3.19-1974 which required, *inter*

*alia*, 10 test subjects to be fitted with the Combat Arms hearing protection devices and for both sides of the device to be tested to determine an appropriate NRRs.

Closed End Testing

29.     After only eight of the ten test subjects were tested on the closed ends of the Combat Arms Earplugs, data revealed an average NRR of 10.9—less than half of the noise reduction capacity necessary for a combat performance earplug. Upon further inspection, Aearo personnel discovered that even when the insertion procedures were performed by knowledgeable lab personnel (as opposed to the test subjects), the design defect still manifested a material degradation of the sound attenuation capabilities of the Earplugs. Indeed, because the stem of the earplug was so short, it was difficult to insert the Earplug deeply enough into the subject's ear canal to obtain a proper fit, as required by ANSI S3.19-1974, §3.2.3.[1] When the closed end of the Earplug was inserted into the subject's ear according to standard fitting instructions, the basal edge of the third flange of the opposite side of the Earplug (the open end) pressed against the subject's ear canal and folded backwards. When the inward pressure on the earplug was released, the flanges of the open end tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the test subject.[2]

30.     In order for the Earplug to function correctly, the flanges on the non-inserted end of the Earplugs had to be folded back prior to insertion into the test subject's ear. With this new knowledge of how to compensate for the defect, Aearo personnel retested the closed end of the earplug using a revised fitting method. By folding back the flanges of the open end of the earplug

---

[1] See, Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA SID 1-1975).
[2] 3M's Answer to First Amended Complaint in *Moldex-Metric, Inc.* v. *3M Company, et aI.,* No. 14-cv-1821-JNE-FLN (D. Minn.) at ¶¶ 35-36.

it essentially elongated the defectively short stem thereby allowing the Earplug to be inserted deeper into the ear to achieve a proper fit. As a result of using this modified fitting procedure, Aearo was able to artificially double the noise reduction rating on the closed end of the Earplug to an average of 22—barely meeting the capacity requirements for a combat performance earplug.[3]

Open End Testing

31.     Due to the symmetrical structure of the dual-ended Combat Arms™ Earplug, the design defect that affected the fit of the closed end of the earplug also affected the fit of the open end. NRR testing on the open end of the Earplug revealed an equally skewed but opposite, result of -2 NRR, meaning the earplug actually amplified sound—a result that could only occur because the defect that prevented proper sealing also enabled the test subjects to hear as if they were not wearing Earplugs. Defendant rounded the NRR up to more plausible '0' and claimed the open end of the Earplugs were so good that wearers of these Earplugs would be better able to hear commands from friendly soldiers and approaching enemy combatants in the same way as if they had nothing in their ears, while still receiving protection. Unlike the closed end side of the Earplugs, Aearo did not re-test the open end using the modified fitting procedure, knowing that to do so would invariably increase the actual NRR significantly above 0 (meaning the Earplug would amplify, rather than attenuate, the noise) and undermine its claim that the open end of the Earplugs provided protection as well as a virtually unimpaired ability to hear voice commands and approaching enemy combatants.

D.      Sales of the Combat Arms™ to the Government

32.     As its name implies, the Combat Arms™ Earplugs, Version 2 (CAEv2), were designed for military personnel to use in combat situations. For the product to be financially viable,

---

[3] *Id.*

therefore, it would have to be sold to the military. To that end, Aearo sought to become a supplier of combat earplugs to the U.S. military. Critically, this required Aearo to submit and win a Request for Proposal ("RFP" or "Solicitation") issued by the U.S. Government for combat earplugs.[4]

33.     In order to successfully participate in the RFP, however, manufacturers were required to expressly certify that their earplugs complied with the RFP's Salient Characteristics of Medical Procurement Item Description ("SCMPID"). The SCMPID required the following:

     a.     §2.1.1. Earplugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield;

     b.     §2.2.2. The sound attenuation of both ends of the Earplugs shall be tested in accordance with ANSI S3.19;

     c.     §2.4 The Earplugs shall be free from all defects that detract from their appearance or impair their serviceability;

     d.     §2.5 Illustrated instructions explaining the proper use and handling of the Earplugs shall be supplied with each unit ....[5]

34.     3M, through its predecessor Aearo, violated each of these requirements when submitting the RFP as it was aware testing procedures and fitting instructions were unlawfully manipulated to obtain the NRRs represented by Defendant. 3M continued to use these inaccurate NRRs to market the Earplugs to the military for more than ten (10) years without disclosing the design defect in the Earplugs or the skewed test results. The closed end of the earplug provides a

---

[4] Solicitation No. SP0200-06-R-4202 attached hereto as Exhibit 1.
[5] Solicitation No. SP0200-06-R-4202 at 41-42.

22 NRR only if inserted using non-standard instructions for use that 3M did not disclose to wearers. As a result, the noise protection offered by the Earplugs was grossly overstated in violation of ANSI S3.19 protocols, 40 C.F.R. § 211.201, et seq., and 42 U.S.C. § 4901, et seq. Meanwhile, the open end of the Earplug's 0 NRR (and actually -2, resulting in noise amplification) is based on unreliable data derived from tests in which the Earplugs were not fitted properly in the subjects' ears.

35.     As required by law, 3M included in the packaging standard instructions for proper use.[6] 3M's standard instructions for "proper use," however, did not instruct wearers to fold back the flanges before inserting the Earplug into the ear. *Id.* Instead, 3M improperly instructs wearers to simply "[d]etermine the proper end (green or yellow) for insertion … . Grasp the earplug by the stem and insert into ear canal." *Id.*

36.     By failing to instruct wearers of the dual-ended Combat Arms™ Earplug to fold back the flanges on the open/unblocked end of the Earplug before inserting the closed end of the Earplug into their ears (which is necessary to achieve the "22" NRR and avoid the defect associated with the short stem), 3M falsely overstated the amount of hearing protection provided by the closed end of the Earplug directly resulting in the loss of hearing, tinnitus and other hearing maladies affecting tens of thousands of soldiers.

**E.     Hearing Impairment is a Significant Issue Among Soldiers**

37.     Hearing loss is a significant and ongoing healthcare issue for soldiers. Data collected by the Department of Veteran Affairs ("DVA") shows that as many as 52% of combat soldiers return from foreign conflicts with significant hearing damage, which represents the largest ongoing medical cost of the military.[7] 3M was pointedly aware of the dangers of hearing loss among soldiers,

---

[6] Combat Arms Earplugs Instructions attached hereto as Exhibit 2.
[7] Researchers Evaluate True Effects of Hearing Loss for Soldiers, David E. Gillespie, (Dec. 16, 2015), available at
https://www.army.mil/article/160050/researchers_evaluate_true_effects_of_hearing_loss_for_sol

while shamelessly touting the efficacy of its Earplugs. "3M has a strong commitment to hearing conservation…."[recognizing that] [m]ilitary personnel are exposed to excessive noise levels during combat and training… [and that] [t]his noise exposure has led many personnel to experience hearing loss and tinnitus, which is currently the number-one service-related disability for veterans."[8]

## F.    The False Claims Act Complaint

38.    On May 12, 2016, Moldex-Metric, Inc., a designer and manufacturer of non-linear dual-mode earplugs, filed suit in the name of the United States Government under the False Claims Act to recover penalties and damages arising from false statements made by 3M to the Government regarding its Combat Arms™ Earplugs.

39.    On July 26, 2018, the Department of Justice announced that 3M agreed to pay $9.1 million to resolve allegations made in the Qui Tam Complaint that it knowingly sold the Earplugs, Version 2 (CAEv2) to the United States military without disclosing defects that hampered the effectiveness of the hearing protection device. [9]

## G.    Plaintiff has Suffered Damages and Requires Diagnostic Testing and Mitigation

40.    Plaintiff asserts on behalf of himself and the Class that 3M failed to eliminate, correct, or warn of, and instead concealed the design defect plaguing its Combat Arms™ Earplugs,

---

diers (last visited January 29, 2019).
[8]3M Hearing Protection Devices Now Added to the Federal Procurement List (August 30, 2012) available at https://news.3m.com/press-release/3m-hearing-protection-devices-now-added-federal-procurement-list (last visited January 29, 2019)
[9] 3M Company Agrees to Pay $9.1 Million to Resolve Allegations That it Supplied the United States With Defective Dual-Ended Combat Arms Earplugs available at https://www.justice.gov/opa/pr/3m-company-agrees-pay-91-million-resolve-allegations-it-supplied-united-states-defective-dual (last visited January 29, 2018)

which exposed the wearer to dangerous levels of impulse noise which the Earplugs were designed to attenuate.

41.     During their respective military careers, Plaintiff and the Class were issued Combat Arms™ Earplugs, used them and in so doing were unknowingly exposed to unnecessary and excessive levels of impulse noise due to the design defect in the Earplugs.

42.     By using 3M's Earplugs, all Class members were exposed to noise levels that the Earplugs, absent the defect, should have safely attenuated, but did not, and resulted in the increased risk of hearing loss, impairment and other auditory maladies.

43.     Exposure to a single event of excessive impulse noise can cause hearing damage and other auditory maladies such as tinnitus. Hearing loss can be subtle and undiagnosed, and progressive.

44.     Defendant was fully aware (and upon information and belief, the government was not aware) of the defect in the Earplugs; that its testing procedures and fitting instructions were unlawfully manipulated to obtain inflated NRRs; that it purposefully obscured this in the process of responding to the government's RFP, and that it failed to eliminate such defect.

45.     Defendant's negligence, fraudulent concealment, omissions of material fact, intentional and/or negligent misrepresentations, and failure to warn as to the product defect and risks of exposure to impulse noise have caused Plaintiff's and the Class to suffer the increased risks of hearing related damage.

46.     Absent Defendant's negligence, fraud, breach of duties, misrepresentations, or any combination of such acts, the exposure to dangerous levels of impulse noise and the resulting risks of hearing loss would have been materially lower or non-existent.

47.     As a direct and proximate result of 3M's misconduct, Plaintiff and the Class are at an increased risk of developing serious auditory conditions in the future. Such increased risk was reasonably foreseeable to 3M.

48.     As a direct result of 3M's conduct, Plaintiff and the Class are in need of costly diagnostic testing for the detection of hearing damage. Specifically, the cost of the monitoring procedures that are reasonably necessary to enable Plaintiff and the Class to obtain detection and diagnosis of auditory conditions are made necessary as a result of Defendant's tortious conduct described herein.

49.     Diagnostic testing for early signs or symptoms of auditory conditions is reasonably medically necessary to assure early diagnosis and effective treatment of auditory dysfunction. The increased risk of exposure to harmful levels of noise to Plaintiff and the Class and the need for diagnostic testing was and is a reasonably foreseeable consequence of 3M's tortious conduct.

50.     Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of auditory conditions that Plaintiff and members of the Class are at increased risks of developing. Such testing, which includes, but is not limited to, baseline and diagnostic exams, will enable early treatment and benefit the class.

51.     Such monitoring for latent auditory conditions is highly specialized and different from the medical care that is normally recommended to people of a similar age, in the absence of a history of exposure to excessive levels of impulse noise.

52.     Plaintiff and the Class seek as damages the costs of such diagnostic testing for the early detection of injury to allow for early treatment beneficial to Plaintiff and the Class. Diagnosis of one specific auditory condition in the course of the diagnostic testing does not foreclose diagnostic testing for other, yet undiagnosed, auditory condition, but rather indicates further testing

within the program. Diagnostic testing will identify the need for adequate treatment, management, and rehabilitation in the event an auditory condition is diagnosed and be beneficial to Plaintiff and the Class.

53.     Separately and in addition, 3M's negligence, fraudulent concealment, omissions of material fact, intentional and/or negligent misrepresentations, and failure to warn, have caused the reasonable need for mitigation of diagnosed hearing loss suffered by Plaintiff and Class Members. Such mitigation is common to Plaintiff and Class Members based on the damage identified by the hearing loss detected. The need for such mitigation requires an award of the cost of such mitigation to Plaintiff and the Class.

54.     The increased risk of exposure to harmful levels of noise to Plaintiff and the Class and the need for mitigation were and are a reasonably foreseeable consequence of 3M's tortious conduct. Early mitigation is both medically reasonable and necessary and beneficial to Plaintiff and the Class.

55.     Thus, Plaintiff and the Class further seek an award of damages of the cost of reasonably medically necessary common mitigation.

56.     Plaintiff and Class Members have suffered the annoyance and inconvenience associated with the diagnostic testing and mitigation made reasonably necessary by Defendant's negligence, fraudulent concealment, and fraudulent omission.

57.     As an alternative to the award of damages to Plaintiff and the Class to be administered by Plaintiff and the Class, Plaintiff and the Class respectfully request the court to establish a court-administered fund for the damages awarded.

58.     Plaintiff and the Class also seek all other available and necessary relief in connection with this claim.

## CLASS ALLEGATIONS

59.     Plaintiff seeks relief on behalf of himself and on behalf of a Class consisting of all

U.S. Military personnel that received and used Combat Arms™ Earplugs. Pursuant to Fed. R. Civ.

P. 23(a), (b)(2), and (c)(4), Plaintiff seeks certification of a nationwide class defined as follows:

> All current and former U.S. Military personnel that received and used Combat
> Arms™ Earplugs, Version 2 (CAEv2).

60.     Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and (c)(5) Plaintiff seeks

certification of damages classes defined as:

**a.     Diagnostic Testing (Medical Monitoring) Class**

All current and former U.S. Military personnel that received and used 3M™ dual-

ended Combat Arms Earplugs, Version 2 (CAEv2) who have not filed a civil action

for personal injury.

**Mitigation Class**

All current and former U.S. Military personnel that received and used 3M™ dual-

ended Combat Arms Earplugs, Version 2 (CAEv2) who have been medically

diagnosed as having hearing damage but have not filed a civil action for personal

injury.

61.     Excluded from the Class is 3M, its affiliates, parents, or subsidiaries, and any entities

in which 3M or its affiliates, parents, or subsidiaries have a controlling interest, and 3M's officers,

agents, and employees. Also excluded from the Class are the judge assigned to this action, members

of the judge's staff, and any member of the judge's immediate family.

62.     Plaintiff hereby reserves the right to amend or modify the class definition with

greater specificity or division after having had an opportunity to conduct discovery.

63.     The proposed Classes meets the criteria for certification under Rule 23(a), (b)(2), (b)(3), (c)(4), and (c)(5).

64.     **Numerosity.** The members of the Class are so numerous that joinder of all members of the Class would be impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff reasonably believes that Class members number in the tens of thousands of soldiers who were issued Combat Arms™ Earplugs and used them to their detriment. The names and addresses of Class members are identifiable through documents 3M, the Government, and other third parties maintain.

65.     **Commonality. Fed. R. Civ. P. 23(a)(2), (b)(2), and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. There are questions of law and fact which are common to the Class. The common questions under Rule 23(a)(2) and (b)(2), and (b)(3) include:

    a.    Whether 3M owed a duty of care to Plaintiff and Class Members;

    b.    Whether the duty of care owed to Plaintiff and Class Members included the duty to warn about the defect in the Earplugs;

    c.    Whether the duty of care owed to Plaintiff and Class Members included the duty to warn about the long-term consequences of exposure to high levels of impulse noise without adequate hearing protection;

    d.    Whether 3M breached its duty to warn Plaintiff and Class Members of the defect in the Earplugs;

    e.    Whether 3M breached its duty to warn Plaintiff and Class Members of and protect Plaintiff and Class Members from the long-term health risks and

consequences of exposure to high levels of impulse noise without adequate hearing protection;

f.    Whether 3M failed to instruct Plaintiff and Class Members on the proper use of the Earplugs;

g.    Whether normal use of the Earplugs exposed Plaintiff and Class Members to unsafe levels of impulse noise.

h.    Whether 3M knowingly concealed the defect in the Earplugs from Plaintiff and Class Members;

i.    Whether 3M fraudulently concealed the defect in the Earplugs from Plaintiff and Class Members;

j.    Whether 3M fraudulently failed to disclose material information to Plaintiff and Class Members regarding the existence of the defect;

k.    Whether 3M fraudulently failed to disclose material information to Plaintiff and Class Members regarding the falsified testing procedures;

l.    Whether 3M recklessly concealed the defect in the Earplugs from Plaintiff and Class Members;

m.    Whether 3M was aware that its testing procedures and fitting instructions were unlawfully manipulated to gain government approval;

n.    Whether 3M intended to induce and expected Plaintiff and Class Members to reasonably rely on the fraudulent concealment of the defect and risks associated with use of the Earplugs;

o.    Whether Plaintiff's and Class Members' reliance on 3M's instructions and misrepresentations were reasonable;

p.      Whether Plaintiff's and Class Members' reliance on 3M's concealment of the defect were reasonable;

q.      Whether 3M's actions and omissions were committed with deliberate disregard of military personnel health and safety, in order to preserve a lucrative contract with the Government;

r.      Whether 3M's actions and omissions were committed with intentional disregard of military personnel health and safety, in order to preserve a lucrative contract with the Government;

s.      Whether Plaintiff and Class Members were damaged by 3M's conduct;

t.      Whether medical monitoring and early detection will provide benefits to Plaintiff and Class Members; and

u.      Whether mitigation will provide benefits to Plaintiff and Class Members.

66.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (c)(4).** Consistent with Rule 23(a)(2) and 23(c)(4), the common questions also present separate issues that may be certified for class-wide resolution pursuant to Rule 23(c)(4). Those common issues include:

a.      Whether 3M owed a duty of care to Plaintiff and Class Members;

b.      Whether the duty of care owed to Plaintiff and Class Members included the duty to warn about the defect in the Earplugs;

c.      Whether the duty of care owed to Plaintiff and Class Members included the duty to warn about the long-term consequences of exposure to high levels of impulse noise without adequate hearing protection;

d.      Whether 3M breached its duty to warn Plaintiff and Class Members of the defect in the Earplugs;

e.      Whether 3M breached its duty to warn Plaintiff and Class Members of and protect Plaintiff and Class Members from the long-term health risks and consequences of exposure to high levels of impulse noise without adequate hearing protection;

f.      Whether 3M failed to instruct Plaintiff and Class Members on the proper use of the Earplugs;

g.      Whether normal use of the Earplugs exposed Plaintiff and Class Members to unsafe levels of impulse noise.

h.      Whether 3M knowingly concealed the defect in the Earplugs from Plaintiff and Class Members;

i.      Whether 3M fraudulently concealed the defect in the Earplugs from Plaintiff and Class Members;

j.      Whether 3M fraudulently failed to disclose material information to Plaintiff and Class Members regarding the existence of the defect;

k.      Whether 3M fraudulently failed to disclose material information to Plaintiff and Class Members regarding the falsified testing procedures;

l.      Whether 3M recklessly concealed the defect in the Earplugs from Plaintiff and Class Members;

m.      Whether 3M was aware that its testing procedures and fitting instructions were unlawfully manipulated to gain government approval;

n.      Whether 3M intended to induce and expected Plaintiff and Class Members to reasonably rely on the fraudulent concealment of the defect and risks associated with use of the Earplugs;

o.      Whether Plaintiff's and Class Members' reliance on 3M's instructions and misrepresentations were reasonable;

p.      Whether Plaintiff's and Class Members' reliance on 3M's concealment of the defect were reasonable;

q.      Whether 3M's actions and omissions were committed with deliberate disregard of military personnel health and safety, in order to preserve a lucrative contract with the Government; and

r.      Whether 3M's actions and omissions were committed with intentional disregard of military personnel health and safety, in order to preserve a lucrative contract with the Government.

67.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class members. Plaintiff is a soldier in the U.S.M.C. who was issued and used 3M's Combat Arms™ Earplugs. Plaintiff's damages and injuries are akin to other Class members, and Plaintiff seeks relief consistent with the relief of the Class.

68.     **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against 3M to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including product liability and other complex litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

69.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The

quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against 3M, and thus, individual litigation to redress 3M's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

70.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

71.     Finally, all members of the proposed Class are readily ascertainable. The Government maintains records of all its personnel and whether they were issued 3M's Combat Arms™ Earplugs. With this information, Class members can be identified, and their contact information ascertained for the purpose of providing notice to the Class.

**COUNT I**
**ACTION FOR DECLARATORY RELIEF – LIABILITY**

72.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

73.     There is an active case and controversy among Plaintiff and the Class on the one hand, and 3M on the other.

74. Pursuant to 28 U.S.C. §2201, Plaintiff seeks a declaration as to the following:

    a. That 3M knew or reasonably should have known, at all material times, that the Earplugs were defective, thereby exposing the wearer to unsafe levels of impulse noise;

    b. That 3M recklessly endangered Plaintiff and members of the Class.

75. Plaintiff and the Class are at an increased risk of developing hearing loss, tinnitus or other auditory damage, or have already developed such maladies which requires common mitigation. As such, a declaratory judgment is warranted to prevent future harm to Plaintiff and the Class.

### COUNT II
### NEGLIGENCE

76. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

77. 3M had a duty of reasonable care to act in the best interests of the health and safety of the soldiers who wore the Earplugs to protect against excessive levels of impulse noise associated with their duties as military personnel.

78. As part of this duty of reasonable care, 3M was required to adequately disclose and/or instruct military personnel in the proper use of the Earplugs. In light of the design defect, the standard instructions were ineffective and inappropriate. In contravention of its duty of care, 3M failed to inform Plaintiff and Class members of the defect.

79. 3M's failure to properly instruct Plaintiff and Class members resulted in exposure to excessive levels of impulse noise and caused their auditory injuries.

80.    As a direct and proximate result of the 3M's negligence, it is liable to Plaintiff and the Class for the full measure of damages allowed under applicable law including the cost of diagnostic testing and mitigation made reasonably necessary by Defendant's tortious conduct.

**COUNT III**
**FRAUDULENT CONCEALMENT**

81.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

82.    3M knowingly, recklessly and fraudulently concealed from Plaintiff and the Class material information regarding the defective design of the Earplugs.

83.    3M was aware that its testing procedures and fitting instructions were unlawfully manipulated to obtain the NRRs it wanted on both ends of the dual-ended Combat Arms™ Earplug. This grossly overstated the noise protection offered by this end of the Earplug.

84.    3M's instructions concealed the defect from Plaintiff and the Class members.

85.    3M knew, intended to induce and expected that Plaintiff and the Class would reasonably rely on the fraudulent concealment of the defect and risks associated with use of the Earplugs.

86.    Plaintiff and the Class reasonably relied on that concealment to their detriment, during their military service.

87.    3M's actions and omissions were committed, with deliberate or reckless disregard of military personnel health and safety, in order to preserve a lucrative contract with the Government.

88.    Had Plaintiff and the Class been aware of such information, they would have used alternate non-defective earplugs.

89.     As a direct and proximate result of 3M's fraudulent concealment, Plaintiff and the Class have suffered and continue to suffer the increased risk of developing latent auditory maladies and the cost of diagnostic testing and mitigation made reasonably necessary by Defendant's tortious conduct.

90.     Defendant 3M's conduct as alleged herein was willful, wanton, malicious and in reckless disregard of the rights of Plaintiff and the Class.

<u>COUNT IV</u><br/><strong>FRAUD BY OMISSION / FAILURE TO WARN</strong>

91.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

92.     3M had a duty to promptly changed the design, or disclose the defect and warn of the increased risk of injury likely to result from the use the Earplugs.

93.     3M breached that duty by, *inter alia*, fraudulently failing to disclose material information to Plaintiff and the Class regarding the existence of the defect, and the falsified testing procedures.

94.     By 3M's concealing these material facts, Plaintiff and the Class were exposed to significant harm resulting from exposure to excessive levels of impulse noise.

95.     Plaintiff and the Class justifiably relied on 3M's fraudulent omissions to their substantial detriment.

96.     Had Plaintiff and the Class been aware of such information they would have not used the Earplugs or used a non-defective earplug to ensure their auditory safety.

97.     As a direct and proximate result of 3M's fraud by omission and failure to warn, Plaintiff and the Class have suffered and continue to suffer the increased risk of developing latent

auditory maladies and the cost of diagnostic testing and mitigation made reasonably necessary by Defendant's tortious conduct.

98.     Defendant 3M's actions as alleged herein were willful, wanton, malicious, and in reckless disregard of the rights of Plaintiff and the Class.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all Class members, respectfully request that the Court enter judgment in their favor and against 3M as follows:

    a.    For an Order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

    b.    For an order granting declaratory judgment in favor of Plaintiff and the Class;

    c.    For an Order granting compensatory and all other damages allowed by law, including pre- and post-judgment interest on applicable Counts;

    d.    For an Order awarding costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law; and

    e.    For an Order granting such other relief allowable at law or equity.

**JURY TRIAL DEMAND**

Plaintiff, individually and on behalf of the Class, demands a jury trial on all issues so triable.

March 1, 2019                                **MANDELBAUM SALSBURG, PC**

    By: _____
        Steven W. Teppler
        steppler@lawfirm.ms
        D.C. Bar #445259
        3 Becker Farm Road
        Roseland, NJ 07068

11891 US Highway One, Suite 100
North Palm Beach, FL 33408
Tel: (202) 253-5670
Fax: (561) 214-4130

John A. Yanchunis*
jyanchunis@ForThePeople.com
Ryan J. McGee*
rmcgee@ForThePeople.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

Kevin S. Hannon**
khannon@hannonlaw.com
D.C. Bar No. 416287
**THE HANNON LAW FIRM, LLC**
1641 Downing Street
Denver, CO 80218
(303) 861-8800

*Pro Hac admission to be filed*
**Admission Pending*